13 CIV 3587

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL SEVY, on behalf of himself and all others similarly situated, | : <br> : <br> : Docket No. <br> : <br> : ECF Case <br> : <br> : <br> : CLASS ACTION COMPLAINT <br> : <br> : <br> : JURY TRIAL DEMANDED <br> : |
|                Plaintiff, | |
|    v. | |
| BP PLC, ROYAL DUTCH SHELL PLC, STATOIL ASA AND JOHN DOE NOS. 1-50, | |
|                Defendants. | |

RECEIVED

MAY 28 2013

U.S.D.C. S.D.N.Y.
CASHIERS

Michael Sevy ("Plaintiff"), individually and on behalf of all those similarly situated, by his undersigned counsel, brings this action under the antitrust and commodities laws of the United States and common law, against BP plc, Royal Dutch Shell plc and Statoil ASA (collectively, "Defendants") and alleges, upon knowledge as to himself and his own acts, and upon information and belief as to all other matters, as follows:

## NATURE OF CLAIM

1.      This case arises from a conspiracy among the largest energy companies in the world to fix, raise, maintain and/or stabilize prices in restraint of trade and to intentionally manipulate prices of North Sea Brent Crude Oil ("Brent Crude Oil") and the prices of Brent Crude Oil futures contracts traded on the New York Mercantile Exchange ("NYMEX") and the Intercontinental Exchange ("ICE") during the period from at least January 1, 2002 through the present (the "Class Period"), and to block competitors from participating in the pricing process, in violation of the Sherman Act, 15 U.S.C. §1, the Commodity Exchange Act ("CEA"), as amended 7 U.S.C. § 1, *et seq.*, and common law.

2.      Defendants agreed to deliberately report inaccurate, misleading and false information regarding Brent Crude Oil prices to Platts, a unit of McGraw Hill Financial Inc., and the leading global provider of spot and contract pricing for the physical and financially-settled-derivative Brent Crude Oil markets. Platts' Brent Crude Oil prices are used worldwide, including in the United States, to price and settle Brent Crude Oil deals under long-term contracts on a physical (spot) basis, and to settle Brent Crude Oil derivatives contracts, including NYMEX and ICE Brent Crude Oil futures contracts. False reporting of Brent Crude Oil prices to Platts thereby undermines the entire pricing structure for the Brent Crude Oil market.

3.    As major producers and market participants in the Brent Crude Oil market, as well as contributors of Brent Crude Oil prices to Platts, Defendants had and continue to have market power and the ability to influence prices in the Brent Crude Oil market. By purposefully reporting inaccurate, misleading and false Brent Crude Oil trade information to Platts, Defendants manipulated and restrained trade in both the physical (spot) Brent Crude Oil market and the Brent Crude Oil futures market.

4.    On May 14, 2013, the European Commission ("EC") confirmed that it, along with the EFTA Surveillance Authority in one European Economic Area ("EEA") Member State, had carried out raids on the offices of "several companies active in and providing services to the crude oil, refined oil products and biofuels sectors."

5.    The EC conducted the raids because of concerns that the companies colluded in reporting distorted prices to a Price Reporting Agency to manipulate the published prices for a number of oil and biofuel products.

6.    In addition, the EC expressed "concerns that the companies may have prevented others from participating in the price assessment process, with a view of distorting published prices" due to their dominant market position.

7.    As the EC explained in a statement issued on the same day as the raids:

> The prices assessed and published by Price Reporting Agencies serve as benchmarks for trade in the physical and financial derivative markets for a number of commodity products in Europe and globally. Even small distortions of assessed prices may have a huge impact on the prices of crude oil, refined oil products and biofuels purchases and sales, potentially harming financial consumers.

8.    Soon after the EC's raids, Defendants BP plc ("BP"), Royal Dutch Shell plc ("Shell") and Statoil ASA ("Statoil") each publicly confirmed their offices had been "inspected" by the EC and/or other regulatory authorities and that they are subjects of the EC investigation.

9.      Platts also confirmed that its London offices were raided by the EC.

10.     In addition, the EC has requested information from a number of other industry participants relating to its investigation of collusion and price manipulation in the Brent Crude Oil market.

11.     The EC's investigation may have been spurred by complaints from other participants in the energy industry.  As reported in *Bloomberg* and *The Guardian*, the EC received a complaint from Pannonia Ethanol, a Hungarian biofuel producer, in the spring of 2012.  Pannonia complained that Platts' refused to permit Pannonia to contribute to its price-setting process.

12.     More significantly, as reported by *Oil & Gas Financial Journal*, French energy giant Total, S.A. ("Total") "appears to be the party that alerted the European Commission to improprieties in the Brent market settlement process.  Total has reportedly provided materials and examples of collusive practices that led to this week's raids."

13.     On May 17, 2013, the United Kingdom's Serious Fraud Office announced that it was "urgently reviewing" the EC's allegations of price-fixing in the oil markets and determining whether to accept the case for "criminal investigation."

14.     That same day, U.S. Senator Ron Wyden, Chair of the Senate Committee on Energy and Natural Resources, wrote to Attorney General Eric Holder in his capacity as Chair of the Financial Fraud Enforcement Task Force and urged the U.S. Department of Justice to join the EC investigation in its efforts and to investigate potential violations of criminal and civil laws in the United States involving the manipulation of Brent Crude Oil prices.

15.     The foregoing investigations are expected to yield information from Defendants' internal records (*e.g.*, instant messages, e-mails, telephone records, Brent Crude Oil trading data,

etc.) that will provide further support for Plaintiff's claims. Plaintiff believes further evidentiary support for the allegations will be unearthed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

16.     This action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, Section 22 of the CEA, 7 U.S.C. § 25, and common law.

17.     Brent Crude Oil is a "commodity" and is the "commodity underlying" the Brent Crude Oil futures contracts traded on NYMEX and ICE, as those terms are defined and used in Section 1a(9) and 22 of the CEA, 7 U.S.C. §§ 1a(9) and 25(a)(1)(D), respectively.

18.     This Court has jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, Section 22 of the CEA, 7 U.S.C. § 25, and 28 U.S.C. §§ 1331 and 1337. This Court also has jurisdiction over the state law claim under 28 U.S.C. § 1367 because that claim is so related to the federal claim that it forms part of the same case or controversy, and under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

19.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), (c) and (d), Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, and Section 22 of the CEA, 7 U.S.C. § 25. One or more of the Defendants resided, transacted business, were found, or had agents in the District, and a part of the acts or omissions giving rise to the claims occurred in the Southern District of New York.

20.     The New York Mercantile Exchange ("NYMEX") is located in this District at One North End Avenue, New York, New York. Further, Platts' global headquarters are located

in New York, New York.  Platts is a unit of McGraw Hill Financial Inc., which is also
headquartered in New York, New York.  The Brent Crude Oil prices published and compiled by
Platts are widely disseminated in the U.S. to Brent Crude Oil spot and futures traders, including
Plaintiff, located in this District and throughout the United States.

## INTERSTATE COMMERCE

21.     The activities of Defendants and their co-conspirators as described herein were
within the flow of and substantially affected interstate commerce.

22.     During the Class Period, substantial quantities of Brent Crude Oil futures
contracts were traded on the NYMEX in a continuous and uninterrupted flow of interstate
commerce to customers located throughout the United States.

## PARTIES

23.     Plaintiff Michael Sevy is a citizen of Illinois.  Plaintiff traded thousands of
NYMEX and ICE Brent Crude futures contracts during the Class Period at artificial prices due to
Defendants' unlawful manipulation and restraint of trade as alleged herein.  Plaintiff was
deprived of transacting in a lawful, non-manipulated, competitive market in Brent Crude Oil
futures, and otherwise suffered legal injury as a direct and proximate result of Defendants'
unlawful conduct.

24.     Defendant BP Plc is multinational oil and gas company headquartered in London,
England, United Kingdom.

25.     Defendant Royal Dutch Shell Plc is a multinational oil and gas company
headquartered in The Hague, Netherlands.  Shell's U.S. subsidiary, Shell Oil Company, is
headquartered in Houston, Texas.

26.     Defendant Statoil ASA is a Norwegian oil and gas company headquartered in Stavanger, Norway.  It was formed by the 2007 merger of Statoil with the oil and gas division of Norsk Hydro.  Statoil maintains offices in the United States, including in Stamford, Connecticut, Washington, D.C. and Houston, Texas.

27.     John Doe Defendants Nos. 1-50 are other entities or persons, including oil, gas or other energy companies as well as other co-conspirators whose identities are currently unknown to Plaintiff.  The John Doe Defendants participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein.

## AGENTS AND UNNAMED CO-CONSPIRATORS

28.     Various other entities and individuals participated as co-conspirators and manipulators in the acts complained of and performed acts and made statements that aided and abetted and furthered the unlawful conduct as alleged herein.  The unnamed co-conspirators, along with the above-named Defendants, performed, participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of the prices of Brent Crude Oil and Brent Crude Oil futures contracts.

## SUBSTANTIVE ALLEGATIONS

I.     **Background**

A.     **Brent Crude Oil: The Physical Trading Market**

29.     The Brent physical crude oil market consists of (1) Dated (or wet) Brent; and (2) Cash (or forward) Brent.

30.     Dated Brent is a major trading classification of sweet light crude oil comprising a basket of North Sea crudes: Brent, Forties, Oseberg and Ekofisk.  Together, Brent, Forties,

Oseberg and Ekofisk are known to crude oil traders as the "Brent Crude" market or "BFOE." The Brent oilfields in the North Sea currently have the highest physical daily output of any of the world's recognized oil benchmarks (*e.g.*, WTI and Dubai).

31.     Dated Brent crude is the world's leading international crude oil benchmark, and it is used as the reference price for about 50 – 70% of the world's physical crude oil trade. It is used and published by Platts, the world's largest oil Price Reporting Agency.

32.     This benchmark underpins the price of exchange-traded derivatives, including futures contracts.

33.     Dated Brent refers to the spot price for Brent Crude Oil. Dated Brent is a rolling assessment that reflects the price of physical, wet BFOE cargoes loading no less than ten days forward. Specifically, Dated Brent cargoes loading 10-25 days forward will be taken into account Monday through Thursday. On Friday, Dated Brent cargoes loading 10-27 days forward will be taken into account. Deals done, as well as bids and offers, may be taken into account for assessment purposes. Originally, the Dated Brent market was assessed on a 7 to 15 day range, *i.e.*, cargoes loading 7 to 15 days forward. The assessment period was extended to 10 to 21 days in 2002, and then again in 2012 to its current 10 to 25 day assessment period.

34.     By contrast, "Cash BFOE," also known as, "cash Brent" or "Forward Brent," are forward contracts for a particular month, with no specified date of loading. Cargoes from a "cash" contract month are progressively "dated" or "wetted," until the 25th day before the end of that delivery month, at which point all cargoes for that delivery month must become "Dated." Cash cargoes become Dated cargoes when they have been "assigned a date" to be loaded onto a tanker. The cash BFOE cargoes trade in chains between potential users of the physical oil until it becomes a "Dated" cargo.

**B.    Brent Crude Oil: The Futures Market**

35.    A commodity futures contract is a standardized agreement to buy or sell a commodity, such as Brent Crude Oil, at a date in the future.

36.    Futures contracts have two sides: The "long" side is the buyer of the contract who is obligated to take delivery and pay for the commodity if the buyer holds the contract until the specified delivery date. The "short" side is the seller of the contract who is obligated to make delivery of the commodity on the delivery date.

37.    Only a small percentage of all futures contracts traded each year result in delivery of the underlying commodities. Instead, traders generally offset their futures positions before their contracts mature. For example, a purchaser of a futures contract can cancel or offset his or her future obligation to the contract market/exchange clearing house to take delivery of crude oil by selling an offsetting futures contract. The difference between the initial purchase or sale price and the price of the offsetting transactions represents the realized profit or loss.

38.    Futures markets like NYMEX and ICE are specifically designed to facilitate and ease trading in one central market place for traders who are located throughout the United States and the world.

**(a)    NYMEX**

39.    NYMEX is a designated contract market under Section 5(b) of the CEA, 7 U.S.C. § 7(b). NYMEX is the world's largest physical commodity futures exchange and the preeminent forum for energy. There are a number of futures contracts based on the Brent Crude Oil benchmark that can be purchased or sold on NYMEX.

40.    Trading in NYMEX Brent Crude Oil futures products is subject to the rules and regulations of NYMEX.

41.     NYMEX contains a number of traded futures contracts priced, settled or benchmarked to Brent Crude Oil.  These contracts are transacted electronically on the Chicago Mercantile Exchange ("CME") Globex and CME ClearPort trading platforms.  Globex is an electronic trading platform owned by the CME Group, the parent company of NYMEX.

42.     In addition to trading on electronic platforms, many futures contracts such as the Brent Crude Oil Last Day Futures (BZ) and the Brent Financial Futures (CY) trade through open outcry at the NYMEX in New York.  Open outcry is a method of public auction for making bids and offers in the trading pits of the futures exchange.

43.     The daily settlements for the NYMEX Brent Crude Oil (BB) and the Brent Crude Oil Last Day (BZ) futures contracts are equivalent to the settlements in the corresponding ICE Brent Crude Oil futures contracts.

44.     NYMEX futures contracts priced, settled or benchmarked to Brent Crude Oil include:

(a)     *Brent Crude Oil Last Day Financial Futures (BZ)* – Final settlement, following termination of trading for a contract month, is based on the Floating Price. The Floating Price is equal to the ICE Brent Crude Oil Index price as published one day after the final trading day for the delivery month.

(b)     *Brent Financial Futures (CY)* – Final settlement, following termination of trading for a contract month, is based on the Floating Price.  The Floating Price for each contract month is equal to the arithmetic average of the ICE Brent Crude Oil Futures first nearby contract settlement prices for each business day that it is determined during the contract month.

(c)     *Brent Crude Oil Penultimate Financial Futures (BB)* – Final settlement, following termination of trading for a contract month, is based on the Floating Price.

The Floating Price is equal to the ICE Brent Crude Oil Futures first nearby contract settlement price on the penultimate trading day for the delivery month.

(d)    *Brent Crude Oil vs. Dubai Crude Oil (Platts) Futures (DB)* – Final settlement, following termination of trading for a contract month, is based on the Floating Price. The Floating Price for each contract month is the arithmetic average of the ICE Brent Crude Oil Futures first nearby contract settlement price minus the mid-point between the high and low quotations from Platts Crude Oil Marketwire for the Dubai front month price for each business day during the contract month.

(e)    *WTI-Brent Financial Futures (BK)* – Final settlement, following termination of trading for a contract month, is based on the Floating Price. The Floating Price for each contract month is the arithmetic average of the Light Sweet Crude Oil first nearby contract settlement price for each business day that it is determined minus the ICE Brent Crude Oil Futures first nearby contract settlement price for each business day that it is determined during the contract month.

45.    The notional quantity in each of the futures contracts listed above is 1,000 barrels.

(b)    **ICE**

46.    The International Petroleum Exchange of London Limited ("IPE") was one of the world's largest energy futures and options exchanges. Its flagship commodity, Brent Crude, was a world benchmark for oil prices.

47.    In June, 2001, IPE was acquired by the Intercontinental Exchange ("ICE"). Brent Crude Oil futures contracts were traded via open outcry on the floor of the IPE until April 7, 2005, when its name was changed to ICE Futures and all trading in Brent Crude Oil futures was shifted onto an electronic trading platform. ICE Futures Europe is headquartered in London, England.

48.     Today, ICE Futures is the world's largest host of crude and refined oil futures trading, and the ICE Brent Crude futures contract covers about two-thirds of the world's physical oil.

49.     ICE Futures is regulated by the U.K. Financial Conduct Authority, with oversight by the U.S. Commodity Futures Trading Commission for linked contracts.

50.     The ICE Brent Crude Oil futures contract is traded at ICE Futures Europe and executed on the WebICE trading platform, which is distributed in more than 70 countries, including the United States.

51.     In 2012, the ICE Brent Crude Oil futures contract became the world's largest crude oil futures contract in terms of volume, and the volume of Brent Crude Oil futures contracts traded on ICE has almost doubled since 2008.

52.     The size of the ICE Brent Crude Oil futures contract is 1,000 barrels. Prices of ICE Brent Crude Oil futures contracts are quoted in U.S. dollars and cents per barrel.

53.     ICE Brent Crude Oil futures contracts are deliverable contracts based on "exchange for physical" delivery with an option to cash settle, *i.e.*, the ICE Brent Index price for the day following the last trading day of the futures contract.

54.     Trading in ICE Brent Crude Oil futures contracts terminates at the end of the designated settlement period on the Business Day (a trading day which is not a public holiday in England and Wales) immediately preceding: (i) either the 15th day before the first day of the contract month, if such 15th day is a Business Day; or (ii) if such 15th day is not a Business Day, the next preceding Business Day.

55.     The ICE Brent Crude Oil futures contract was developed in 1988 when the Brent crude oil physical market was trading on a 15-day basis. The expiry calendar established at that

11

point, which continues today for existing ICE Brent Crude Oil futures, reflected the 15-day timetable. Existing ICE Brent Crude Oil futures therefore currently expire 10 days after BFOE contracts have started to go "wet," *i.e.*, to turn into specific Dated Brent contracts with respect to the contract delivery month in question.

56.     According to ICE's corporate website, "[t]he ICE Brent futures contract is based on the underlying physical BFOE (Brent-Forties-Oseberg-Ekofisk) market . . . . The ICE Brent futures contract is linked to forward BFOE contracts and hence the underlying Dated Brent market by the Exchange for Physical (EFP) mechanism. The contract settles against the ICE Brent Index price for the day following the last trading day of the Brent futures contract. At expiry of a Brent futures contract, the index price is based on the average value of BFOE cash cargoes on expiry day. The index is also calculated by the exchange every day."

57.     Further, ICE's corporate website states that "[t]he cash settlement price for ICE Brent . . . is based on the ICE Brent Index at their respective expiries. The index represents the average price of trading in the 25-day 'cash' BFOE market in the relevant delivery month as reported and confirmed by the industry media [*e.g.*, Platts]. . . . The index is calculated by the Exchange as an average of the following elements:

(a)     A weighted average of first month cargo trades in the 25-day BFOE market;

(b)     A weighted average of second month cargo trades in the 25-day BFOE market plus a straight average of the spread trades between the first and second months; and

(c)     A straight average of designated assessments published in media reports [*e.g.*, Platts]."

58.     In response to Platts extending its assessment period to 10-25 days, ICE launched

the ICE Brent NX Brent futures contract, which have an expiry calendar based on the 25-Day

BFOE market and therefore align the futures expiry calendar with the physical BFOE market.

     **C.**    **<u>U.S.-Based Transactions in Brent Crude Oil Futures Contracts on ICE</u>**

59.     The U.S. Commodity Futures Trading Commission ("CFTC") granted no-action

relief to ICE and IPE for the domestic (U.S.-based) trading of Brent Crude Oil futures contracts.

60.     On November 12, 1999, the CFTC issued a no-action letter in which it confirmed

that it would not recommend that the CFTC institute enforcement action against IPE (acquired

by ICE in 2001) or its members solely based upon IPE's failure to obtain contract market

designation pursuant to Sections 5 and 5a of the CEA, "if: (i) IPE members trade for their

proprietary accounts through ETS [Energy Trading System II] in the United States; (ii) IPE

members who are registered with the Commission as FCMs [Futures Commission Merchants] or

who are Rule 30.10 Firms submit orders from United States customers for transmission to ETS;

and/or (iii) IPE members who are registered with the Commission as FCMs or who are Rule

30.10 Firms accept orders through United States AORS [Automated Order Routing Systems]

from United States customers for submission to ETS." The CFTC's no-action position applied

to several types of futures contracts, including Brent Crude futures contracts.

61.     The November 12, 1999 IPE no-action letter was amended by the CFTC four

times between July 26, 2002 and April 14, 2003 as trading of the contracts was transitioned from

the ETS to ICE Platform operated by the Intercontinental Exchange, Inc. in Atlanta, Georgia and

trading hours were extended.

62.     Significantly, in the April 14, 2003 amendment, the CFTC confirmed that it

would not recommend that it institute an enforcement action against IPE or its members solely

based upon IPE's failure to seek contract market designation or registration as a derivatives

transaction execution facility under Sections 5 and 5a of the CEA "if the IPE makes all of its current contracts, including Brent Crude futures and options contracts . . . available in the U.S. on the ICE Platform during the course of the entire trading day."

### D.   The Role of Platts in the Brent Crude Oil Market

63.    Nearly all physical BFOE crude oil is traded in the over-the-counter ("OTC") market, where the transaction details are not readily observable.  As a result, Platts plays the central role in establishing and reporting spot prices of Brent Crude Oil.  Indeed, as the figure below shows, Platts' Brent Crude Oil pricing is used as the basis for nearly the entire worldwide oil market:



64.    Platts has a dedicated room where the pricing assessment occurs.  Resembling a small trading floor, price editors are organized by desk covering a particular product.  Bids and offers are generally communicated to Platts' editors by Yahoo® messenger and, when the technology is available to the market concerned, immediately put into Platts' "Ewindow," a trading platform, and on a dedicated page of its wire service.

65.     Main market participants also have Ewindow installed on their respective computers, so that they can put their bids and offers directly on the system.  The Ewindow software interface has been developed by ICE for Platts, and looks very similar to the ICE interface.  The trading platform adheres to Platts' rules.

66.     Platts uses a "Market-On-Close" methodology in establishing and reporting Brent Crude Oil spot prices.  Platts' Market-On-Close methodology is based upon bids, offers and transactions for spot Brent Crude Oil (as reported to Platts) that take place during the 30 to 45 minutes before the close of the market (generally 4:00 p.m. to 4:30 p.m. GMT/BST).  This 30-45 minute period of time is referred to as the "Platts window."  Market participants can adjust their bids and offers during the Platts window subject to Platts' guidelines.

67.     Market participants who fail to declare their intention to submit bids and offers during the Platts window may not submit bids and offers during the Platts window, but may still choose to accept a bid or an offer posted during the Platts window.  Following the close of the market at 4:30 p.m. GMT/BST, Platts' editors examine the bids, offers, and transactions for spot Brent Crude Oil that took place during the Platts window and use that data to establish an end-of-day (or Market-On-Close) Brent Crude Oil spot price.  Platts subscribers have access to the real-time trading data published by Platts during the Market-On-Close process.

68.     Although participation in the Platts' Market-On-Close is voluntary, Platts is highly selective as to which market participants are permitted to participate in its Market-On-Close process.

69.     The integrity of the Platts' Market-On-Close Brent Crude Oil spot price is paramount because it is the most important price marker for Brent Crude Oil in the world.

E.     **Brent Crude Oil Spot and Futures Prices are Inextricably
Linked and Susceptible to Collusion and Manipulation**

70.     The Brent Crude Oil futures market can be thought of as a clearinghouse for

trades among buyers and sellers of Brent Crude Oil futures contracts, which are standardized

contracts used to price Brent Crude Oil at various maturities. The Brent Crude Oil futures

market is inextricably linked to the spot market for Brent Crude Oil and thus to Platts pricing,

and price movements in the spot market can and do cause price movements in the futures

markets.

71.     In particular, Brent Crude Oil futures traders refer to the spot prices published by

the reporting firms, such as Platts, for price discovery and for assessing price risks in the Brent

Crude Oil market. An increase in the spot price published by Platts signals either stronger

demand or weakened supply, and futures traders take account of both price movements and

changes in the supply/demand balance when conducting their futures trading. This price impact

is expected. Brent Crude Oil futures overlay the conventions and conditions of the Brent Crude

Oil spot market. Brent Crude Oil futures prices derive their valuation from spot transactions.

The spot market is the first point in a commercial transaction. Brent Crude Oil spot and futures

prices move in the same direction. That is why futures markets are used to hedge price exposure.

72.     This is just another way of expressing the integrated characteristics and thus

arbitrage realities of Brent Crude Oil. What happens in the Brent Crude Oil spot market by

definition affects Brent Crude Oil futures. The expiration of a Brent Crude Oil futures contract

into a physical position also results in the convergence of price especially when the spot price

sets the futures expiration price. The physical delivery mechanism ensures price convergence

between the spot and futures market. When these high correlations or conversions are disrupted

by the manipulation of prices (creating false values/prices), *i.e.*, a manipulation of the Platts

Brent Crude Oil benchmarks, it has effects that ripple throughout the Brent Crude Oil market.

      73.      As shown in the following flowchart published by the *Financial Times* on May

15, 2013, the Brent Crude Oil futures market is inextricably linked to the spot market for Brent

Crude Oil and thus to Platts pricing:



## Tangled web

### The pricing system

**Energy companies**
Such as
bp
Statoil
TOTAL

**Trading houses**
Such as
GlencoreXstrata   Vitol
TRAFIGURA

**Banks**
Such as
Morgan Stanley

Trade hundreds of blends of crude oil and products

**Areas where the system could be open to manipulation**

1. Oil market is highly fragmented and individual products may trade infrequently

2. Data submission is voluntary and may be selective

   Can choose to submit some quotes and transaction data

3. Assessment process is subjective

Gather more information through contact with traders

**Price reporting agencies**
Such as
PLATTS
McGRAW HILL FINANCIAL

Price reporters decide which quotes most reflect market

Publish hundreds of prices for crude oil and products based on assessment

Combined with taxes

Brent futures and options traded on exchanges including ICE Futures Europe

Petroleum prices

Used by airlines and governments to hedge prices

FT Graphic

18

74.     The chart also demonstrates that the structure of the oil market makes itself open and susceptible to collusion and manipulation by the Defendants: (1) the oil market is highly fragmented and individual products may trade infrequently; (2) data submission on oil trades is voluntary and selective; and (3) the assessment process by Platts is subjective.

## II.   Defendants' Unlawful Conduct Has Led to Government Investigations

75.     On May 14, 2013, the EC carried out unannounced raids at the offices of several companies active in and providing services to the crude oil, refined oil products and biofuels sectors. These raids took place in two EU Member States (England and the Netherlands) and, at the EC's request, in one European Economic Area (EEA) Member State (Norway) by the EFTA Surveillance Authority on the EC's behalf.

76.     With respect to the raids in the EU (London, The Netherlands), EC officials were accompanied by their counterparts from the relevant national competition authorities. In the EEA Member State (Norway), the EFTA Surveillance Authority was accompanied by EC officials and counterparts from the national competition authority.

77.     The EC confirmed the raids in a Memo issued that same day entitled "Antitrust: Commission confirms unannounced inspections in oil and biofuels sectors."

78.     Unannounced inspections are a preliminary step to investigate suspected anticompetitive activities.

79.     According to the EC, it conducted the unannounced raids because of concerns that certain companies "may have colluded in reporting distorted prices to a Price Reporting Agency to manipulate the published prices for a number of oil and biofuel products."

80.     In addition to investigating collusive pricing conduct, the EC also had concerns that the companies "may have prevented others from participating in the price assessment process, with a view of distorting published prices" for a number of oil and biofuel products.

81.    As the EC explained in its May 14, 2013 Memo:

> The prices assessed and published by Price Reporting Agencies serve
> as benchmarks for trade in the physical and financial derivative
> markets for a number of commodity products in Europe and globally.
> Even small distortions of assessed prices may have a huge impact on
> the prices of crude oil, refined oil products and biofuels purchases and
> sales, potentially harming final consumers.

82.    Citing Articles 101 and 102 of the Treaty of the Functioning of the EU and

Articles 53 and 54 of the EEA Agreement, the EC stated that if the collusive and exclusionary

conduct that it was investigating was established, it could amount to "violations of European

antitrust rules that prohibit cartels and restrictive business practices and abuses of a dominant

market position."

83.    While the EC's Memo confirming the unannounced raids did not specifically

identify the entities that were raided, almost immediately following the EC's announcement, BP

plc, Royal Dutch Shell plc and Statoil ASA each confirmed they were "visited" by the EC and/or

other regulatory authorities and are the subject of the EC investigation.

84.    In a May 14, 2013 article in *The Guardian*, BP confirmed that it was "one of the

companies that is subject to an investigation that was announced by the European Commission."

85.    The same article quoted a statement by Shell: "We can confirm that Shell

companies are currently assisting the European commission [sic] in an inquiry into trading

activities."

86.    Statoil issued a press release confirming that its office in Stavanger, Norway was

raided by the EFTA Surveillance Authority, assisted by the Norwegian Competition Authority

(Konkurransetilsynet).

87.    Statoil acknowledged in its statement that its offices were raided at the request of

the EC.  Further, Statoil stated that "[t]he authorities suspect participation by several companies,

including Statoil, in anti-competitive agreements and/or concerned practices contrary to Article 53 of the EE Agreement.  In addition the inspection relates to potential abuse of possible dominant position by another party, contrary to Article 54 of the EEA Agreement."

88.     Statoil also stated in its release that the EC's investigation is "related to the Platts' Market-On-Close (MOC) price assessment process, used to report prices in particular for crude oil, refined oil products and biofuels, and may have been ongoing since 2002."

89.     According to the same *Guardian* article, Platts also confirmed it was being investigated.  The article stated that "Platts said the investigators 'had undertaken a review at its premises in London this morning in relation to the Platts price-assessment process.'"  This was confirmed by Platts spokeswoman Kathleen Tanzy.

90.     A *Financial Times* article entitled "Challenging domination of oil's powerful few" stated that "[f]or decades the physical oil market has been the unregulated preserve of a few powerful companies."  It noted that the "majors raided by the European Commission" in a probe into possible price fixing have "long dominated the trade."

91.     On May 17, 2013, the United Kingdom's Serious Fraud Office ("SFO") announced that it was "urgently reviewing" the EC's allegations of price-fixing in the oil markets and determining whether to accept the case for "criminal investigation."

92.     According to SFO spokeswoman Jina Roe, "[s]ubject to discussions with other agencies as to potential offenses involved, it is likely the SFO could be the appropriate authority to investigate allegations of price-fixing."

93.     Also on May 17, 2013, U.S. Senator Ron Wyden, Chair of the Senate Committee on Energy and Natural Resources, wrote to Attorney General Eric Holder in his capacity as Chair of the Financial Fraud Enforcement Task Force and urged the U.S. Department of Justice to join

the EC investigation in its efforts and to investigate potential violations of criminal and civil laws in the United States involving the manipulation of Brent Crude Oil prices.

94.    Senator Wyden stated that BP, Shell and Statoil "engage in comparable activities in the United States and their oil activities include production from onshore and offshore Federal leases." He continued, stating that "many domestic companies depend upon the London-based Brent oil indices and related contracts to purchase oil and hedge their exposure to world oil markets. . . . Efforts to manipulate the European oil indices, if proven, may have already impacted U.S. consumers and businesses, because of the interrelationships among world oil markets and hedging practices."

95.    As the EC's probe widened, a number of other companies in the industry received requests to provide relevant information to the EC pursuant to its investigation.

96.    Neste Oil Oyj, Finland's only oil refiner, said in a statement that "we have received a request from the European Commission to provide information, along with other companies active on the European market."

97.    Marketing Director Jan Dirks stated that Argos Energies is also part of the investigation, as reported by *Bloomberg*.

98.    Eni SpA, Italy's largest oil company, also received a request for information, a spokeswoman said.

99.    On May 21, 2013, *Bloomberg* reported that energy trading houses Glencore Xstrata plc, Gunvor Group Ltd., and Vitol Group, along with other firms with offices in Switzerland, are assisting the EC with its probe into oil price manipulation.

100.    The EC's investigation may have been spurred by complaints from other participants in the energy industry. As recently reported in *Bloomberg* and *The Guardian*, the

EC received a complaint from Pannonia Ethanol, a Hungarian biofuel producer, in the spring of 2012. Pannonia complained that Platts' refused to permit Pannonia to contribute to its price-setting process.

101.    According to *Bloomberg*, Pannonia stated it sought access for more than a year to trade ethanol products on Platts' daily half-hour window during which benchmarks are set for different fuels on the basis of the participants' bids and offers. Pannonia said it was rejected as a participant in the price-setting process, even after complying with all of Platts' requests for information.

102.    More significantly, as reported by *Oil & Gas Financial Journal*, French energy giant Total, S.A. "appears to be the party that alerted the European Commission to improprieties in the Brent market settlement process. Total has reportedly provided materials and examples of collusive practices that led to this week's raids."

103.    According to *The Economist*, Total also told the International Organization of Securities Commissions, a group of financial regulators, that benchmark prices were out of line with the underlying market "several times a year."

**III.    Defendants' Conduct Had A Direct, Substantial and Reasonably Foreseeable Effect on U.S. Commerce**

104.    Brent Crude Oil and Brent Crude Oil futures contracts are each a commodity that trades in U.S. interstate and foreign commerce. Defendants' restraint of trade and manipulation of Brent Crude Oil and Brent Crude Oil futures contract prices had direct, substantial, and reasonably foreseeable effects in the United States, and on Plaintiff and members of the Class.

105.    Brent Crude Oil futures contracts are traded domestically on NYMEX and on electronic boards of trade and exchanges, such as ICE, which are readily accessible within the United States. Defendants, as sophisticated Brent Crude Oil market participants, knew, or had

good reason to know, that Brent Crude Oil prices published and compiled by Platts are disseminated in the United States and are used to price, settle, and benchmark Brent Crude Oil futures contracts and/or other Brent Crude Oil derivative contracts traded in the United States.

106.    For these reasons, Defendants knew, or had good reason to know, that misreporting the price of Brent Crude Oil to Platts, as well as other manipulative and collusive conduct in the Brent Crude Oil market, would, and did, have direct, substantial and reasonably foreseeable effects in the United States, including, without limitation, on the prices of Brent Crude Oil futures contracts transacted domestically.

## IV.    Defendants Intentionally Manipulated Brent Crude Oil Futures Prices By Falsely Reporting Brent Crude Oil Spot Prices to Platts

107.    Defendants purposefully manipulated prices of Brent Crude Oil and Brent Crude Oil futures contracts through their deliberate and systematic submission of false Brent Crude Oil trade information to Platts.

108.    Defendants knew that this false trade information was used by Platts in calculating and publishing its Brent Crude Oil prices.

109.    Defendants also knew, as sophisticated market participants, that the (mis)information they reported directly impacted the prices of Brent Crude Oil futures contracts and other Brent Crude Oil derivative contracts traded in the United States and elsewhere. Through the conduct alleged herein, Defendants intentionally caused prices of Brent Crude Oil and Brent Crude Oil futures contracts to trade at artificial levels.

## CLASS ACTION ALLEGATIONS

110.    Plaintiff brings this action as a class action against Defendants under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

All persons or entities (other than Defendants and their co-conspirators, employees, parents, subsidiaries, affiliates, or agents) that purchased or sold a Brent Crude Oil futures contract on the NYMEX or ICE during the period from January 1, 2002 to the present (the "Class Period").

111.    The Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of geographically dispersed Class members transacted in Brent Crude Oil futures contracts on the NYMEX and/or ICE during the Class Period.

112.    Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and the Class sustained damages arising out of Defendants' common course of conduct in violation of the laws complained of herein. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests which are adverse to the interests of absent Class members.

113.    Plaintiff has competent counsel experienced in class action litigation, including antitrust and commodities litigation.

114.    There are a number of questions of law or fact common to the Class, including, but not limited to, the following:

    (a)    Whether Defendants manipulated Brent Crude Oil futures contracts in violation of the CEA;

    (b)    Whether such manipulation caused Brent Crude Oil futures contracts to be artificial;

    (c)    Whether such manipulation caused cognizable legal injury under the CEA;

    (d)    Whether Defendants engaged in a conspiracy to fix, raise, maintain and/or stabilize prices for Brent Crude Oil futures contracts

25

(e)     Whether Defendants' conspiracy as alleged in this Complaint violated
Section 1 of the Sherman Act;

(f)     Whether Defendants' unlawful conduct caused injury to the business or
property of Plaintiff and the Class;

(g)     Whether Defendants' conduct impacted the prices of Brent Crude Oil
futures contracts;

(h)     Whether Defendants were unjustly enriched at the expense of Plaintiff and
members of the Class;

(i)     The appropriate measure of damages sustained by Plaintiff and the Class;

(j)     The operative time period and extent of Defendants' foregoing violations;
and

(k)     Whether such injury or the fact or extent of such artificiality may be
established by common, class-wide means.

115.    The questions of law and fact common to the Class predominate over questions
affecting only individual Class members.

116.    A class action is superior to other methods for the fair and efficient adjudication
of this controversy.  Treatment as a class action will permit a large number of similarly situated
persons to adjudicate their common claims in a single forum simultaneously, effectively, and
without the duplication of effort and expense that numerous individual actions would engender.
Class treatment will also permit the adjudication of relatively small claims by Class members
who otherwise could not afford individually to litigate claims such as those asserted in this
Complaint.  The action presents no difficulties in management that would preclude maintenance
as a class action.

117.    The Class is readily identifiable and is one for which records likely exist in the files of Defendants and their co-conspirators.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

118.    By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing.  Defendants falsely reported prices and volume and trade information to Platts in order to manipulate the spot price for Brent Crude Oil and the prices of Brent Crude Oil futures contracts traded on the NYMEX and ICE.

119.    Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until it became public.  The first public reports of any government action relating to Defendants' unlawful conduct occurred on or about May 14, 2013, when the EC confirmed that it carried out unannounced raids at the premises of several companies active in and providing services to the crude oil, refined oil products and biofuels sectors, alleging that these companies colluded in reporting artificial prices to a price reporting agency to manipulate the published prices for a number of oil and biofuel products.

120.    Because Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiff and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure on or about May 14, 2013.

121.    Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(For Manipulation in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq*.)**

**Against All Defendants**

122.    Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

123.    By their intentional misconduct, Defendants each violated Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2), and caused prices of Brent Crude Oil futures contracts to be artificial during the Class Period.

124.    Defendants' trading and other activities alleged herein constitute market power manipulation of the prices of Brent Crude Oil futures contracts in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a).

125.    Defendants' foregoing extensive manipulative conduct deprived Plaintiff and other traders of a lawfully operating market during the Class Period.

126.    Plaintiff and others who transacted in Brent Crude Oil futures contracts during the Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the CEA, 7 U.S.C. § 1, *et seq.*, and as a direct result thereof were injured and suffered damages.

127.    Plaintiff and the Class are each entitled to damages for the violations of the CEA alleged herein.

128.    Plaintiff and members of the Class who purchased or sold Brent Crude Oil futures contracts on NYMEX or ICE during the Class Period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

28

## SECOND CLAIM FOR RELIEF

### (For Principal Agent Liability in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)

### Against All Defendants

129.   Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

130.   Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

131.   Plaintiff and members of the Class are each entitled to actual damages sustained through the purchase and/or sale of Brent Crude Oil futures contracts for the violations of the CEA alleged herein.

## THIRD CLAIM FOR RELIEF

### (For Aiding and Abetting Manipulation in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)

### Against All Defendants

132.   Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

133.   Defendants knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein.  Defendants did so knowing of each other's manipulation of Brent Crude Oil market prices, and willfully intended to assist these manipulations, which resulted in Brent Crude Oil futures contracts to reach artificial levels during the Class Period in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

134.   Plaintiff and members of the Class are each entitled to actual damages sustained through the purchase and/or sale of Brent Crude Oil futures contracts for the violations of the CEA alleged herein.

### FOURTH CLAIM FOR RELIEF

**(For Violation of Section 1 of the Sherman Act, 15 U.S.C. §1, *et seq.*)**

**Against All Defendants**

135.   Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

136.   Defendants entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

137.   During the Class Period, Defendants possessed market power in the setting of Brent Crude Oil prices and the prices of Brent Crude Oil futures contracts.

138.   The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, suppressed and/or made artificial Brent Crude Oil market prices and the prices of Brent Crude Oil futures contracts.  Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

139.   Defendants' conspiracy, and resulting impact on Brent Crude Oil market prices and the prices of Brent Crude Oil futures contracts, occurred in or affected interstate and international commerce.

140.   As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.

141.    As a consequence, Plaintiff and the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

### FIFTH CLAIM FOR RELIEF

### (For Unjust Enrichment)

### Against All Defendants

142.    Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

143.    Defendants financially benefited from their unlawful acts.  These unlawful acts caused Plaintiff and other members of the Class to suffer injury, lose money, and transact Brent Crude Oil futures contracts at artificial prices.

144.    As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner.

145.    Each Defendant should pay restitution or its own unjust enrichment to Plaintiff and members of the Class.

146.    Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

### PRAYER FOR RELIEF

Accordingly, Plaintiff demands relief as follows:

A.    For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class Representative, and his counsel be appointed as Class counsel;

B.      For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

C.      For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

D.      For Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

E.      For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

F.      For a judgment awarding Plaintiff and the Class restitution of any and all sums received by the Defendants' unjust enrichment;

G.      For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

H.      For such other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff respectfully demands a trial by jury of all issues so triable.

Dated: New York, New York
      May 28, 2013

LABATON SUCHAROW LLP

By:

    Gregory S. Asciolla, Esq.
    Jay L. Himes, Esq.
    Matthew J. Perez, Esq.
    140 Broadway
    New York, NY 10005
    Tel: 212-907-0700
    Fax: 212-818-0477

    Brian Levin, Esq.
    Jeffrey B. Kaplan, Esq.
    DIMOND KAPLAN & ROTHSTEIN, P.A.
    Offices at Grand Bay Plaza
    2665 South Bayshore Dr.
    Penthouse 2B
    Miami, FL 33133
    Tel: 305-374-1920
    Fax: 305-374-1961

    *Counsel for Plaintiff and the Proposed Class*